12FOGG, Judge.
This appeal from a judgment dismissing the plaintiffs’ suit involves the issue of whether the owners of a brick mailbox on the *760 shoulder of a highway and the State of Louisiana, Department of Transportation & Development (DOTD), are liable to the plaintiffs in negligence for the death of their son, a passenger in a vehicle which crashed into the mailbox.
The plaintiffs, Steve and Shirley Rogers, filed a wrongful death suit seeking damages for the death of their twenty-one year old son, Scott. Rogers was killed on February 24,1991, while a passenger in a car driven by Lane Daigle, which went out of control on a curve in Highway 316 in Terrebonne Parish and crashed into a 3,000 pound brick mailbox, which was three to four feet off the highway on the shoulder. The case went to trial against the following defendants: Charles Chauvin, II, and Don Calongne, owners of the mailbox; State Farm Fire and Casualty Company, their insurer; and DOTD.[1] After the trial, the court rendered judgment in favor of the defendants. The trial court found that the sole fault for the death of plaintiffs’ son was with the driver of the vehicle. The plaintiffs appeal, contending that the trial court erred in failing to assign any percentage of fault to DOTD and to the owners of the mailbox and their insurer.
As a basis for liability, the plaintiffs rely on guidelines issued by the American Association of State Highway and Transportation Officials (AASHTO) in 1985. According to the guidelines, there are 20 million mailboxes on rural roads and streets, and the limited data on accidents associated with 18mailboxes suggests that possibly 70 to 100 people die annually from vehicles striking mailboxes “where the design of the mailbox or, especially, its support can be shown to have contributed to the severity of the accident.” The guidelines recognize that massive structures such as the mailbox in this case are a “lethal roadside obstacle that should be eliminated,” and that multiple mailbox installations were serious threats.
William Hickey, the road design engineer for DOTD, testified that DOTD began developing the formal policy for adopting these AASHTO guidelines in 1990, which was when he first became personally aware of them. Hickey also testified that in 1986, all new construction projects were to meet the AASHTO guidelines, although there was no formal written policy; the federal government would not accept a state highway project for federal aid without compliance. On February 7, 1992, based on the AASHTO guidelines, DOTD adopted mailbox regulations which require DOTD to remove any mailbox support that does not meet a crash-worthy standard on new construction projects or on overlay projects; the mailbox must also be placed eight to twelve inches from the shoulder, a postal service requirement.
Highway 316 was overlaid in 1990 and 1991. Hickey testified that the mailbox in this case would not be acceptable under the AASHTO regulations, but that there would be no reason to believe that its owners would have been aware of the guidelines; it was not shown that DOTD had any notice of the existence of this particular mailbox. Dr. Olin K. Dart, Jr., the plaintiffs expert witness in traffic engineering, highway design, traffic safety, and accident reconstruction, believed that Louisiana should have adopted these regulations before this accident, and testified that he had begun giving seminars for public officials in which the mailbox problem was addressed in 1989, 1990, and 1991. A letter addressed to the Secretary of DOTD dated June 23, 1987, from the Division Administrator for the Federal Highway Administration was introduced into evidence; the letter stated that federal-aid highway funds could be used for the removal of hazardous mailbox *761 installations |4along existing highways. Hickey testified that the federal government was allowing DOTD to use the funds it normally received to reconstruct highways, and that funds available for one project on a statewide basis were limited, and there was a long list of ongoing projects with greater priority.
On the evening of the accident, Daigle testified that from about 10:00 p.m. until 2:00 a.m., he and Rogers were at two bars, drinking beer; he had from six to eight beers, and he was told after the accident that his blood alcohol level was .07. Upon leaving to go home, Daigle wanted to spend the night at a friend’s house, although he stated that he was not too intoxicated to drive and had no trouble staying awake; Rogers and Daigle en route to their friend’s house decided to turn around and go to Rogers’ house. The accident happened about 3:20 a.m., on their way to Rogers’ house.
The testimony was undisputed regarding how the accident happened. Daigle’s vehicle, which was headed north, crossed the center-line of a moderate S-eurve. After entering the southbound lane, Daigle steered to the left and then began traveling sideways 210 feet from the mailbox; the car then went onto the shoulder twenty-seven feet from the mailbox, rolled onto the passenger’s side, and then slid into the mailbox. Upon the car’s hitting the mailbox, the windshield broke, and the vehicle flipped, rolled over, and came to a stop. After impact with the mailbox, Rogers was ejected from the vehicle and was killed instantly. Daigle did not know why he went onto the shoulder and did not recall trying to get back on the road.
At the time of the accident, the road conditions were good. The posted speed on the highway was 50 m.p.h. and there was no curve warning sign. Although Daigle did not remember his speed when the accident happened, the speed immediately before the accident was estimated to be 68 m.p.h.
Calongne testified that the mailbox had been in its location for thirteen years at the time of the accident. According to Calongne, in the nineteen years he had lived in this location, |sthere were several accidents on both sides of the highway involving telephone poles and trees. Calongne initially testified that he witnessed seven accidents which occurred on the shoulder in front of his house, and all involved speeding and/or drinking; Calongne later testified that some of the accidents were across the highway from his house. Two accidents occurred when a vehicle in the northbound lane went across the centerline and southbound lane, and onto the shoulder. In one of these accidents (which was three to five years before the accident in this case), the vehicle struck the mailbox, destroying it. Calongne and Chauvin rebuilt it in the same style and location. Calongne testified that he never considered removing the mailbox prior to the accident in this case, and that after the accident, he and his neighbor put the mailbox back up. Calongne testified that the postal service instructed them about where to put the mailbox. Calongne testified that he was never notified by DOTD or the postal service that his mailbox presented a hazard, and that if he had been so notified, he would have moved it back; Cal-ongne was unaware of the AASHTO guidelines prior to the accident.
Dr. Dart testified that the mailbox did not cause the accident, but that the accident would not have been as severe but for the close proximity of the mailbox to the road. Dr. Dart also testified that Daigle was speeding at the time of the accident, and that the primary cause of this accident was Daigle’s condition. He testified that an advisory speed for the curve would be 45 m.p.h., but that this was based on the worst road conditions.
Dr. Joseph D. Blaschke, the defendant’s expert in traffic engineering, roadside safety, and accident reconstruction, testified that the primary cause of the accident was Daigle’s loss of control of the vehicle and travel at an excessive speed in an impaired condition. Dr. Blaschke stated that the curve could be negotiated safely in dry weather conditions at 50 m.p.h. Both Drs. Dart and Blaschke testified that the highway had no defects.
In his reasons for judgment, the trial judge stated that he drove the curve where the accident happened at 50 m.p.h. and at 68 | (¡m.p.h. (the estimated speed of the Daigle *762 vehicle at the time of the accident), and there were no signs of a possible loss of control; the judge opined that the curve could easily be negotiated at 68 m.p.h. and 75 m.p.h. He noted that Daigle was very familiar with the highway, having grown up in the area. The judge found that the mailbox owners were not negligent in that there was no showing of prior knowledge of a dangerous condition. He then determined that the sole cause of this accident was the negligence of Daigle, and noted that if this were an accident on the shoulder where such an accident would logically occur, that is, on the outside edge of the curve, he might conclude differently. The judge pointed out that when Daigle lost control he was not using the shoulder to recover control, but rather, his vehicle was simply out of control. The judge stated that but for the mailbox, Rogers might not have been killed, but that he would consider that DOTD knew of the recommendations regarding mailbox placement, but had not adopted them.
This court cannot disturb the trial court’s finding if we find from the record that there is a reasonable factual basis for the finding, and the record establishes that the finding is not clearly wrong or manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d 880 (La.1993). When conflicting evidence creates two possible views of the evidence, and the trier of fact’s choice between the views is reasonable in light of the entire record, an appellate court may not reverse merely because it would have chosen the alternate view. Rosell v. ESCO, 549 So.2d 840 (La.1989).
We believe the trial court erred in failing to assess any fault to the defendants. Although the driver was impaired and was speeding, the mailbox was a substantial cause of the plaintiffs’ son’s death. See Simpson v. State, DOTD, 636 So.2d 608 (La.App. 1st Cir.). Because of the AASHTO guidelines, DOTD was aware or should have been aware as early as 1985 that mailboxes such as this one were lethal roadside hazards; in fact, in 1986, it began implementing ÁASHTO regulations ^regarding mailboxes in new construction. The letter DOTD received in 1987 shows that federal funds were available for removal of such hazardous mailboxes, and therefore, DOTD should have begun removal of them at the time. However, DOTD overlaid Highway 316 in 1990 and 1991 without having the mailbox removed. We conclude that DOTD’s failure to remove the mailbox while overlaying the highway in question, armed with knowledge of the hazardous nature of the mailbox, was a breach of a duty DOTD owed to the driving public to maintain a reasonably safe roadway and shoulder. DOTD enjoys no immunity from liability for its operational decision not to remove the mailbox. See Chaney v. National Railroad Passenger Corp., 583 So.2d 926 (La.App. 1st Cir.1991). We find that DOTD should have been assessed with 10% of fault.
We also find that the trial court erred in failing to assess any fault to the owners of the mailbox. Calongne and Chauvin should have been aware that the mailbox presented a hazard, given the many accidents on the highway in front of their property involving telephone poles and trees. In particular, two accidents occurred in a manner similar to the one in the case at bar, and in one of these accidents, a vehicle hit the mailbox, destroying it; at that point, they should have realized it was hazardous to drivers on Highway 316. Yet, Calongne and Chauvin did not consider removing the mailbox, but instead rebuilt it in the same style and location. We find that Calongne, Chauvin, and State Farm should have been assessed with 3% of the fault.
Additionally, we find that the trial court erred in failing to find the United States Postal Service at fault. Postal regulations required this mailbox to be located so near to the road; the postal service should be aware of the hazards presented by a massive structure such as the mailbox in this case. Fault in the amount of 7% should have been assessed to the United States Postal Service.
Because the trial court did not find the defendants liable, it did not reach the issue of damages. The record shows that the Rogers were a close family, and engaged in many activities together. Rogers visited with his parents daily and slept and ate *763 Igmeals at their home often; at the time of the accident, Rogers maintained a residence ■with his brother in a small house provided by and near his parents. When the accident happened, Rogers was working with his father. Accordingly, we fix damages for the loss of their son at $150,000 for Mr. Rogers, and $150,000 for Mrs. Rogers. We also award $5,417.08 for funeral and burial expenses.
Therefore, we reverse the judgment of the trial court, and assess 10% fault to DOTD, 3% fault to Calongne, Chauvin, and State Farm, and 7% fault to the United States Postal Service.[2] We fix damages for the loss of their son at $150,000 for Mr. Rogers and $150,000 for Mrs. Rogers; we also award $5,417.08 for funeral and burial expenses. Costs of this appeal to be assessed as follows: $964.00 to DOTD, and $964.00 to Calongne, Chauvin, and State Farm.
REVERSED IN PART AND RENDERED; AFFIRMED IN PART.

. Lane T. Daigle and his insurer, State Farm Mutual Automobile Insurance Company, and Prudential Property and Casualty Insurance Company, the plaintiffs’ uninsured motorist insurer, were initially named as defendants, but the plaintiffs dismissed their demands against them.
State Farm, Mr. Chauvin, Mr. Calongne, and DOTD filed third party demands against the United States Postal Service. The Postal Service filed a petition to remove the case to the federal court, but the federal court later granted the plaintiffs' motion to remand the case to state court, stating in its ruling that Mr. Chauvin, Mr. Calongne, and State Farm voluntarily dismissed their third party demand, and that DOTD failed to name the proper defendant in its third party demand. All third party demands were eventually dismissed.

. Some of the appellees argue in their briefs to this court their contention that Scott Rogers was at fault for riding with Daigle in his "condition.” It is unnecessary for us to address this issue, as we are powerless to assess the plaintiffs’ decedent with any degree of fault absent an appeal or answer to the appeal having been filed by the appellees.